699 So.2d 616 (1997)
Mario Albo LARA, Appellant,
v.
STATE of Florida, Appellee.
No. 79849.
Supreme Court of Florida.
June 19, 1997.
Rehearing Denied September 15, 1997.
Billy H. Nolas and Julie D. Naylor, Philadelphia, PA, for Appellant.
Robert A. Butterworth, Attorney General and Fariba N. Komeily, Assistant Attorney General, Miami, for Appellee.
PER CURIAM.
This is an appeal from a resentencing proceeding. At the resentencing, the trial court again imposed a sentence of death upon Mario Albo Lara. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. For the reasons expressed, we remand for another resentencing.
Lara was originally charged in 1981. He was subsequently tried for one count of first-degree murder, one count of second-degree murder, and one count of involuntary sexual battery. He was convicted of those three offenses. For the first-degree murder, he was sentenced to death after the penalty-phase jury recommended death by a margin of eight to four. His convictions and sentence of death were affirmed by this Court in Lara v. State, 464 So.2d 1173 (Fla.1985).
Lara subsequently filed a motion for postconviction relief grounded primarily on the ineffectiveness of his trial counsel in the penalty phase of the original proceeding. The trial court, after an evidentiary hearing, agreed that trial counsel was ineffective and vacated Lara's sentence of death. This Court affirmed the vacation of Lara's death sentence. State v. Lara, 581 So.2d 1288 (Fla.1991). A new penalty-phase proceeding was held. The general factual circumstances that led to Lara's conviction were presented to the second penalty-phase jury. Those facts, presented here as set out in our opinion on Lara's initial appeal, are as follows:
On July 16, 1981, a Miami police officer was dispatched to meet Francisco Rizo at an apartment where Rizo had discovered the body of his girlfriend, Grisel Fumero. Rizo let the officer into the apartment and directed him to the kitchen where Fumero was lying face-down on the floor in a pool of blood. She had been shot four times. *617 During the investigation of the crime scene, an upstairs tenant notified the police that there was another body in an upstairs bedroom. This body was identified as that of [Lara's] girlfriend, Olga Elviro. She had been bound and gagged and had been stabbed three times. Evidence introduced at trial indicated that Elviro had also been raped. A handgun found on the premises was determined to have been the weapon that fired at least one of the bullets into Fumero. The police also recovered a serrated knife which was tentatively identified as the weapon used to stab Elviro.
Evidence presented at trial established that, at the time of the homicides, [Lara] was awaiting trial on charges of robbery and voluntary and involuntary sexual battery. The sexual battery victim was Fumero's 13-year-old sister and Fumero was expected to testify against appellant at trial, which was to have begun the week of the homicides. There also was evidence that Elviro had learned of the charges against [Lara] and had threatened to leave him. Further, on the day prior to the homicides, [Lara] had displayed two handguns and had threatened to kill Elviro and her sister-in-law, who had apparently told Elviro of the charges against [Lara].
The evidence further established that, on the day of the homicides, [Lara] went to the upstairs apartment, woke Tomas Barcelo, and stated that he and Elviro needed to use the apartment. Barcelo left the apartment, went out into the yard, and, about half an hour later, saw [Lara] leave the apartment alone. [Lara] next went to the downstairs apartment where he was admitted by Fumero. He went through the kitchen into his brother's bedroom in the same apartment. At this time Barcelo was in the kitchen at the request of Fumero. [Lara] returned to the kitchen with his hands behind his back and told Fumero, "It's your fault that I have lost everything." He then pulled a gun from behind his back and shot Fumero in the stomach. She said, "Mario, Mario, why are you doing that to me?" [Lara] replied, "Why am I doing that? Son of a bitch," and continued firing until the gun was empty. [Lara] continued to pull the trigger after the gun was empty. [Lara's] brother, Arsenio Lara, was in the room at this time and both he and Barcelo told [Lara] he was a murderer. [Lara] retorted, "Oh, I'm a murderer," and, while laughing, started to reload the gun. [Lara's] brother and Barcelo, believing they would also be killed, ran out of the apartment.
Lara, 464 So.2d at 1175.
In the resentencing proceeding, the defense put on witnesses to testify as to the substantial abusive treatment Lara received from his father. In addition, mental health experts presented evidence that Lara had, in the past, been diagnosed with paranoid schizophrenia. One expert, Dr. Edmund Cava, testified that Lara has a borderline personality disorder.
After the presentations by both the State and Lara were completed, the trial judge instructed the penalty-phase jury. He included the standard jury instruction as to the statutory aggravator applicable if a homicide is committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification. The instruction used was the identical instruction we found to be constitutionally invalid in Jackson v. State, 648 So.2d 85 (Fla.1994).
The second penalty-phase jury recommended a sentence of death by a margin of seven to five. The trial judge followed the jury's recommendation and imposed a death sentence, finding the following three statutory aggravators: (1) The defendant was previously convicted of another capital felony or a felony involving the use or threat of violence to the person; (2) the capital felony was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws; and (3) the capital felony was a homicide and was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification. The sentencing order recognizes no statutory mitigation but does accept as mitigation the difficult early years experienced by Lara. In his sentencing order, the trial judge stated: "Extensive psychological and psychiatric testimony establish that such brutalization had a profound and negative effect *618 on the defendant's conduct when he became an adult." The trial judge, however, made a specific finding that "the aggravating circumstances outweigh the mitigating circumstances."
In this appeal, Lara raises nine issues. The first issue is determinative. Lara argues that the jury was given an improper instruction on the cold, calculated, and premeditated statutory aggravating factor. As previously noted, the trial judge used the exact instruction that this Court ruled unconstitutionally vague in Jackson. There we also held that a specific objection at trial was necessary to preserve claims of this nature. Id. at 90.
The State argues that, in this case, Lara failed to make a specific vagueness objection at trial. We reject this contention. From our review of the record, it is clear that there was a discussion as to appropriateness of the instruction at issue. The record reflects that defense counsel stated: "There really isn't any definition of cold and calculated that is sufficient." After further discussion, the court then said, "I will deny it because I am going to rely on the jury to use their common sense." It is clear to us from reviewing the record that defense counsel satisfied our requirement that a specific objection be made at trial. In addition, defense counsel proposed another expanded instruction that required the jury to consider whether there was a "carefully planned, prearranged design to kill or a substantial period of reflection and thought by the defendant before the murder." The request to give that instruction was denied. It is significant to note that in Jackson we defined "cold" as meaning "the product of calm and cool reflection." We defined "calculated" as meaning "the defendant had a careful plan or prearranged design to commit the murder." 648 So.2d at 89 n. 8. The proposed expanded instruction is consistent with our holding in Jackson. We find that the objection to this instruction was properly preserved and that the trial judge erred in instructing the jury on this aggravating factor.
As a result of this finding, we now must determine whether this error was harmless beyond a reasonable doubt.
We have stated that this type of error is harmless if "the murder could only have been cold, calculated, and premeditated without any pretense of moral or legal justification even if the proper instruction had been given." Walls v. State, 641 So.2d 381, 387 (Fla.1994)(citing State v. DiGuilio, 491 So.2d 1129 (Fla.1986)). Accordingly, in order to find the error harmless, we must be satisfied that the four elements of this aggravator were sufficiently established. See Wuornos v. State, 644 So.2d 1000, 1008 (Fla.1994)(conducting harmless error analysis by looking at the four elements independently). In explaining the meaning of the CCP aggravator, we have written:
As noted above, the jury in this case was instructed that it could consider, if established by the evidence, that "the crime for which the defendant is to be sentenced was committed in a cold, calculated, and premeditated manner without a[ny] pretense of moral or legal justification." This standard instruction simply mirrors the words of the statute. Yet this Court has found it necessary to explain that the CCP statutory aggravator applies to "murders more cold-blooded, more ruthless, and more plotting than the ordinarily reprehensible crime of premeditated first-degree murder," Porter v. State, 564 So.2d 1060, 1064 (Fla.1990), cert. denied, 498 U.S. 1110, 111 S.Ct. 1024, 112 L.Ed.2d 1106 (1991), and where the killing involves "calm and cool reflection." Richardson v. State, 604 So.2d 1107, 1109 (Fla.1992). The Court has adopted the phrase "heightened premeditation" to distinguish this aggravating circumstance from the premeditation element of first-degree murder. Id.; Rogers v. State, 511 So.2d 526, 533 (Fla.1987), cert. denied, 484 U.S. 1020, 108 S.Ct. 733, 98 L.Ed.2d 681 (1988). The Court has explained that "calculation" constitutes a careful plan or a prearranged design. Rogers, 511 So.2d at 533. These explications by the Court make it clear that CCP encompasses something more than premeditated first-degree murder.
Jackson, 648 So.2d at 88-9.
As noted, the defendant presented both substantial mitigating evidence and significant *619 expert testimony for consideration by the penalty-phase jury. Under the circumstances of this case, including the seven-to-five vote by the jury, we are unable to say beyond a reasonable doubt that the unconstitutionally vague jury instruction at issue (and, as a consequence, the omission of the requested instruction) did not affect the jury's considerations and recommendation. Because we find that this error is not harmless, it is unnecessary to address Lara's other claims.
For the reasons expressed, we vacate the sentence of death imposed on Lara and remand with directions that a new penalty-phase proceeding before a new jury be commenced within 120 days.
It is so ordered.
OVERTON, SHAW, HARDING and ANSTEAD, JJ., concur.
GRIMES, J., dissents with an opinion, in which WELLS, J., concurs.
GRIMES, Judge, dissenting.
I agree that defense counsel preserved his objection to the instruction on the cold, calculated, and premeditated aggravator. However, I believe the failure to give the more expansive instruction required by Jackson v. State, 648 So.2d 85 (Fla.1994), was harmless error.
Evidence demonstrated that the capital murder victim, Grisel Fumero, was a material witness in pending rape charges against the defendant made by Fumero's sister. Lara convinced his housemate, Frank Rizzo, who was dating Fumero, to try to persuade her not to testify against him. He told Rizzo to ask Fumero to move into their house, ask her to marry him, and convince her not to be a witness. Rizzo stated "that he was just waiting for the trial to be over" and that if he got rid of Fumero any sooner Lara would kill him. However, after Fumero moved in, Rizzo's other girlfriend warned her of these plans in Lara's presence. Realizing that Fumero could not be dissuaded from testifying, the following day Lara obtained a gun from under a bedroom pillow and confronted Fumero in the kitchen. He pulled out the gun, stating, "It's your fault that I have lost everything," and shot her six times.
By any standard, the murder was committed in a cold, calculated, and premeditated manner. See Walls v. State, 641 So.2d 381 (Fla.1994) (the murder could only have been cold, calculated, and premeditated, without any pretense of justification, even if proper instruction had been given). Coupled with the proof that Lara was ultimately convicted of the sexual battery of Fumero's sister and had prior convictions of murder and armed robbery, I am convinced that there is no reasonable possibility that the erroneous instruction contributed to the jury's recommendation.
WELLS, J., concurs.