IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 32960-7-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| GENE A. CAMARATA, | ) | |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — By virtue of to-convict instructions proposed by the State, the "law of the case" in prosecuting Gene Camarata for voter and candidate fraud required the State to prove beyond a reasonable doubt that Mr. Camarata provided false information in Kittitas County, Washington. Yet a good deal of the State's own evidence suggested that Mr. Camarata, who was homeless, transmitted the information from outside Kittitas County, to either Thurston or Spokane counties, and that the information was only relayed thereafter to Kittitas County. Because reasonable jurors could not conclude beyond a reasonable doubt from the evidence presented that Mr. Camarata provided false information in Kittitas County, his convictions are reversed and we remand with directions to dismiss the charges.

FACTS AND PROCEDURAL BACKGROUND

In April and May 2012, Gene Camarata called the Kittitas County Auditor's office 30 to 50 times with questions about registering to vote so he could run for a political

office. He generally spoke with Susan Higginbotham, the county's election supervisor, who had known Mr. Camarata for many years from his contacts with the office. He asked Ms. Higginbotham about school district and precinct committee officer positions that might be up for election.

Ms. Higginbotham told Mr. Camarata during the course of their conversations that he needed to reside in Kittitas County to run for office there, and he told her of two addresses in Ellensburg that he might use to run for office: 1001 East Eighth Avenue, unit 4, and Ellensburg Chevrolet, where he sometimes slept in a boat. Ms. Higginbotham knew the Eighth Avenue address to be for an apartment complex where Mr. Camarata once lived but that no longer existed at that location. On at least one occasion during their conversations in the spring of 2012 she asked Mr. Camarata if he was even *in* Ellensburg, but he would not reveal his whereabouts to her.

On May 17, 2012, Mr. Camarata registered to vote online, using the Washington Secretary of State's MyVote website. He then called Ms. Higginbotham to see if his registration had gone through. She searched the voter database and saw that it had. She also saw that the online voter registration form Mr. Camarata submitted electronically that day listed his residential address as "1001 E. 8th Ave., (#4) ELLENSBURG WA 98926," and his mailing address as "General Delivery Ellensburg WA 98926." Ex. 2-A. Mr. Camarata had signed the voter oath by using a signature that the MyVote website imports from a voter registrant's driver's license.

2

Ms. Higginbotham later checked the Washington Election Information website and determined Mr. Camarata had filed a declaration of candidacy for precinct committee officer for the county's 22nd precinct as a Democrat on May 18, 2012. The declaration of candidacy imported "1001 E. 8th Ave., (#4)" from his online voter registration form as his residential address. Ex. 3-B.

The county prosecutor notified the Kittitas County Sheriff's Office of possible election fraud by Mr. Camarata in June 2012, and a detective, Darren Higashiyama, was assigned to investigate. He spoke with Mr. Camarata at that time, who told the detective he had been living in buses in Yakima. Yakima is in Yakima County, not Kittitas County. As part of his investigation, the detective attempted to send Mr. Camarata letters to the general delivery, Ellensburg mailing address he had provided and to "1001 E. 8th Ave. #4." Both were returned by the Ellensburg post office.

In October 2012, Mr. Camarata sent Detective Higashiyama two letters that bore a return address of "General Delivery, Ellensburg," but that were postmarked from Portland, Oregon.

In May 2013, the State of Washington charged Mr. Camarata with one count of violation of the voter registration law contrary to RCW 29A.84.130(1), and one count of providing false information on a declaration of candidacy in violation of RCW 29A.84.311(1). Both are class C felonies. The case proceeded to a jury trial.

3

At trial, the State called both the Kittitas County auditor and an information specialist from the Secretary of State's Office in Olympia to testify about the MyVote website operated by the secretary of state. The State's evidence established that the secretary of state's office maintains two databases supporting the conduct of elections: a voter registration database and a Washington election information database. Online voter registration is available to anyone who is eligible to vote in Washington and who has a driver's license or identification card (ID) issued by the Washington Department of Licensing.

The prosecutor had the election information specialist demonstrate online voter registration to the jury. The information specialist explained that after confirming citizenship status and age on the MyVote website, a voter registrant is required to enter a residential address so the voter can be tied to the proper precinct. He testified that a homeless registrant can enter a nontraditional address in the residential address field, describing as best they can where they reside, even (by way of example) under a bridge. The online registration form allows an individual to put down a separate mailing address in the event they do not receive mail at their residence or prefer to receive their mail somewhere else.

The election information specialist testified that once all of the required information has been entered by a voter registrant using the MyVote website, a review page appears, enabling the registrant to edit any errors. The bottom of the form contains

4

an oath that states "I declare that the facts on this voter registration form are true. . . . I will have lived at this address in Washington for at least thirty days immediately before the next election at which I vote." Ex. 1-B. The MyVote website imports a voter registrant's Washington driver's license or ID card signature to the online voter registration form. In order to complete the online registration process, the registrant must affirmatively check boxes attesting to the voter's oath, and authorizing importation of the voter's signature. According to the Kittitas County auditor, once the registration is completed, the information is "forwarded" by the secretary of state to the county auditor's office and voter database, "notif[ying]" the county of the new voter information. Report of Proceedings (RP) (Nov. 24, 2014) at 51-52.

The prosecutor also had the election information specialist describe for the jury how a candidate can complete an online declaration of candidacy with the Secretary of State's Office. The candidate provides name and date of birth information, which then imports the registrant's residential address from the voter's online voter registration form. The website will then show certain elective offices based on the candidate's residence address, or the candidate can look at all county elective offices. The candidate selects the office for which he or she wants to declare candidacy, and enters his or her name as it will appear on the ballot. Before an individual can submit the declaration, the candidate must declare that the information is true and "that I am a registered voter residing at the residential address and precinct listed above." Ex. 1-C.

5

The State presented evidence that Mr. Camarata had lived at 1001 East Eighth Avenue, unit 4, in Ellensburg from at least 2001 to 2008, and had earlier provided that address in registering to vote. It presented evidence that in 2008, Kittitas County acquired the property at 1001 East Eighth Avenue, which it used for police and fire department training exercises. During a fire department training exercise in December 2008, the apartment building at 1001 East Eighth Avenue was burned to the ground. The jury was presented with evidence that by the May 2012 time frame of Mr. Camarata's online voter registration, 1001 East Eighth Avenue was an unpaved vacant lot, sometimes used for overflow and recreational vehicle (RV) parking by the Kittitas County fairgrounds.

Detective Higashiyama testified that by 2012, Mr. Camarata was itinerant and had no permanent address. During the detective's testimony, he identified and the court admitted a photograph of a driver's license issued to Mr. Camarata in December 2010 that included the address of the Red Apple Motel in Yakima as Mr. Camarata's residence. Detective Higashiyama testified he had known Mr. Camarata to be found in motels in Pasco and a mission in Multnomah County, Oregon, and had personally met Mr. Camarata at motels in Yakima and Pasco.

The court's to-convict jury instructions for the voter registration and candidate fraud crimes both indicated (consistent with the jury instructions proposed by the State) that in order to convict Mr. Camarata, the State must prove beyond a reasonable doubt

6

that Mr. Camarata had provided false information "in Kittitas County, Washington."

Clerk's Papers (CP) at 62, 64. Specifically, jury instruction 6 stated in relevant part,

> To convict the defendant of the crime of Violation of Voter Registration Law, the State of Washington must have proved beyond a reasonable doubt that:
>
> (1) On or about May 17, 2012, *in Kittitas County, Washington*, the defendant knowingly provided false information on an application for voter registration.

CP at 62 (emphasis added). Jury instruction 8 stated in relevant part,

> To convict the defendant of the crime of Providing False Information on Declaration of Candidacy, the State of Washington must have proved beyond a reasonable doubt that:
>
> (1) On or about May 18, 2012, *in Kittitas County, Washington*, the defendant knowingly provided false information on his declaration of candidacy.

CP at 64 (emphasis added).

The State did not offer evidence as to where Mr. Camarata was when he used the online voter registration or declaration of candidacy systems. Detective Higashiyama admitted when cross-examined that he was unable to determine what Internet Protocol (IP) address was used to submit Mr. Camarata's online voter registration form and declaration of candidacy.

The State's evidence had established that the secretary of state's voter and candidate databases are physically located on the servers of the digital archives in Cheney, which is in Spokane County. Like the county auditor, who testified that voter information is "forwarded" to the county from the secretary of state's system, the election

7

information specialist described the secretary of state's MyVote website system as "sending" voter registration information to counties, to be imported into their systems; elsewhere, he described the county's information as "com[ing] down" from the secretary of state's system. RP (Nov. 24, 2014) at 52, 167, 169-70.

At the close of the State's case, Mr. Camarata's lawyer moved for a directed verdict on the basis that the State had not met its burden of proof, specifically including its failure to prove that Mr. Camarata provided the false information in Kittitas County. The motion was denied.

During deliberations, the jury sent the following written inquiry to the trial court:

Please give some clarification on [jury instruction 6.] (1) Did Gene need to be in Kittitas? Or, (2) was the crime in Kittitas County[?] (Physically)

CP at 82. The trial court responded: "Please refer to, and follow, the instructions you were provided." *Id.*

The jury found Mr. Camarata guilty as charged. He unsuccessfully moved for a judgment notwithstanding the verdict on the renewed ground that the State failed to prove beyond a reasonable doubt that the false information had been provided in Kittitas County. The trial court reasoned that Mr. Camarata waived any improper venue and that there was sufficient evidence to prove by a preponderance of the evidence, which the court deemed to be the proper standard of proof, that he was physically in Kittitas County when he registered online. It imposed three months' confinement for Mr. Camarata, but

8

granted credit for time served which resulted in Mr. Camarata's immediate release. Mr. Camarata appeals.

## ANALYSIS

Mr. Camarata makes five assignments of error, but we find his challenge to the sufficiency of the evidence to establish that he provided false information in Kittitas County, Washington to be dispositive.[1]

Venue is neither an element of a crime nor a matter of jurisdiction, but is a constitutional right guaranteed under the Washington Constitution. 12 ROYCE A. FERGUSON, JR., WASHINGTON PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 1601, at 348 (3d ed. 2004). As relevant, article 1, section 22 of the Washington Constitution provides:

> In criminal prosecutions the accused shall have the right . . . to have a
> speedy public trial by an impartial jury of the county in which the offense is
> charged to have been committed.

The constitutional right may be waived by failing to object to improper venue. *State v. Dent*, 123 Wn.2d 467, 479-80, 869 P.2d 392 (1994). When venue is at issue, it need only

---

[1] Mr. Camarata's other assignments of error are that (1) the evidence was insufficient to prove that he knowingly provided a false address on his voter registration form and knowingly provided false information on his declaration of candidacy, (2) the prosecutor committed misconduct by misstating the law during closing arguments, (3) the trial court violated his public trial right by conducting peremptory challenges at sidebar, and (4) the trial court erred by excusing a juror who had previously been convicted of a felony without inquiring into whether the juror's civil rights had been restored.

be proved by a preponderance of the evidence. *Id.* at 480.

Mr. Camarata's argument has never been that venue was improper. He has consistently argued, instead, that by unnecessarily including an allegation that his crimes were committed in Kittitas County in the to-convict instructions, the State was required to prove that contention beyond a reasonable doubt. "[J]ury instructions not objected to become the law of the case." *State v. Hickman*, 135 Wn.2d 97, 102, 954 P.2d 900 (1998). Under this doctrine, "the State assumes the burden of proving otherwise unnecessary elements of the offense when such added elements are included without objection in the 'to convict' instruction." *Id.*; *State v. Hobbs*, 71 Wn. App. 419, 423, 859 P.2d 73 (1993) (the law of the case doctrine binds the State to prove additional elements included in accepted jury instructions it proposed).

I. *Hickman* remains controlling Washington law

Following the original briefing of this matter and while our opinion was in process, Division One of our court filed *State v. Tyler*, 195 Wn. App. 385, 396, 382 P.3d 699 (2016), in which it held that *Hickman* is no longer good law following the United States Supreme Court's decision in *Musacchio v. United States*, ___ U.S. ___, 136 S. Ct. 709, 193 L. Ed. 2d 639 (2016). We invited supplemental briefing by the parties and respectfully disagree with *Tyler*.

In *Musacchio*, the Supreme Court—focusing on sufficiency review as required by due process—held that a "reviewing court considers only the 'legal' question 'whether,

after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" 136 S. Ct. at 715 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)).

The Fifth Circuit Court of Appeals had analyzed sufficiency review as involving an additional gloss under the federal law of the case doctrine when a jury instruction erroneously adds an element not required for the charge. In that event, the Fifth Circuit explained (subject to an exception not relevant here) "erroneously heightened jury instructions generally become the binding 'law of the case' on appeal." *Id.* at 714 (citing *United States v. Musacchio*, 590 Fed. App'x. 359, 362 (5th Cir. 2014), *aff'd*, ___ U.S. ___, 136 S. Ct. 709, 193 L. Ed. 2d 639 (2016)). This was error, the Supreme Court held, because the federal law of the case doctrine "does not bear on how to assess a sufficiency challenge when a jury convicts a defendant after being instructed—without an objection by the Government—on all charged elements of a crime plus an additional element." *Id.* at 716.

The United States Supreme Court is the final word on federal common law, of course, but it was not speaking, nor could it, to the law of the case doctrine under Washington common law. In Washington, the law of the case doctrine *does* bear on how to assess a sufficiency challenge in such circumstances. We quote at length from

11

*Hickman,* including its internal citations, to underscore how well settled Washington

common law is on this score:

> The law of the case is an established doctrine with roots reaching back to the earliest days of statehood. Under the doctrine jury instructions not objected to become the law of the case. *State v. Hames,* 74 Wn.2d 721, 725, 446 P.2d 344 (1968) ("'The foregoing instructions were not excepted to and therefore, became the law of the case.'") (quoting *State v. Leohner,* 69 Wn.2d 131, 134, 417 P.2d 368 (1966)); *State v. Salas,* 127 Wn.2d 173, 182, 897 P.2d 1246 (1995) ("[I]f no exception is taken to jury instructions, those instructions become the law of the case."). In criminal cases, the State assumes the burden of proving otherwise unnecessary elements of the offense when such added elements are included without objection in the "to convict" instruction. *State v. Lee,* 128 Wn.2d 151, 159, 904 P.2d 1143 (1995) ("Added elements become the law of the case . . . when they are included in instructions to the jury.") (citing *State v. Hobbs,* 71 Wn. App. 419, 423, 859 P.2d 73 (1993); *State v. Rivas,* 49 Wn. App. 677, 683, 746 P.2d 312 (1987)). *See also State v. Barringer,* 32 Wn. App. 882, 887-88, 650 P.2d 1129 (1982) ("Although the charging statute . . . did not require reference to [the added element], by including that reference in the information and in the instructions, it became the law of the case and the State had the burden of proving it.") (citing *State v. Worland,* 20 Wn. App. 559, 565-66, 582 P.2d 539 (1978)), *overruled in part on other grounds by State v. Monson,* 113 Wn.2d 833, 849-50, 784 P.2d 485 (1989).
>
> On appeal, a defendant may assign error to elements added under the law of the case doctrine. *State v. Ng,* 110 Wn.2d 32, 39, 750 P.2d 632 (1988) (because the State failed to object to the jury instructions they "are the law of the case and we will consider error predicated on them." (citations omitted)). Such assignment of error may include a challenge to the sufficiency of evidence of the added element. *Barringer,* 32 Wn. App. at 887-88; *Schatz v. Heimbigner,* 82 Wash. 589, 590, 144 P. 901 (1914) ("These alleged errors are not available to the appellants, because they are at cross purposes with the instructions of the court to which no error has been assigned. There is but one question open to them; that is, Is there sufficient evidence to sustain the verdict under the instructions of the court?"); *Tonkovich v. Department of Labor & Indus.,* 31 Wn.2d 220, 225, 195 P.2d 638 (1948) ("It is the approved rule in this state that the parties are bound by the law laid down by the court in its instructions where, as here,

> the charge is approved by counsel for each party, no objections or
> exceptions thereto having been made at any stage. In such case, the
> sufficiency of the evidence to sustain the verdict is to be determined by the
> application of the instructions. . . .").

135 Wn.2d at 101-03 (alterations in original) (footnotes omitted).

Washington's law of the case doctrine serves to avoid prejudice to the parties and ensure that the appellate courts review a case under the same law considered by the jury. *State v. Calvin*, 176 Wn. App. 1, 22, 316 P.3d 496 (2013). The common vantage point is particularly important in a case like this, where the additional element was not the result of a scrivener's error but was consciously believed by the State to be a required proof, and the defense made strategic trial decisions knowing that the State would undertake to prove it. *See id.* at 23 (discussing *Hobbs*, 71 Wn. App. 419).

## II. Sufficiency of the evidence

Accordingly, "We review the sufficiency of the evidence in light of the instructions given." *Millies v. LandAmerica Transnation*, 185 Wn.2d 302, 313, 372 P.3d 111 (2016).

"'The test for determining the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt.'" *State v. Witherspoon*, 180 Wn.2d 875, 883, 329 P.3d 888 (2014) (quoting *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992)). A criminal defendant's claim of insufficient evidence admits the truth of

the State's evidence and "'all inferences that reasonably can be drawn [from it].'" *State v. Condon*, 182 Wn.2d 307, 314, 343 P.3d 357 (2015) (alteration in original) (quoting *Salinas*, 119 Wn.2d at 201).

In denying the motion for judgment notwithstanding the verdict, the trial court applied a preponderance of the evidence standard. Finding *some* evidence that Mr. Camarata was in Kittitas County at the time he registered online (such as his use of a "General Delivery, Ellensburg" address and his mention to Ms. Higginbotham that he had been sleeping in a boat at Ellensburg Chevrolet) the court concluded that reasonable jurors could have found that evidence, however limited, to be sufficient. But the court's application of a preponderance standard was in error, because Mr. Camarata was not challenging venue, he was holding the State to its burden of proving all elements stated in the to-convict instructions. The applicable standard is proof beyond a reasonable doubt.

There was too much evidence that Mr. Camarata was often *not* in Kittitas County for a rational jury to find beyond a reasonable doubt that he was there on May 17 and 18, 2012. His most recent driver's license placed him in Yakima County. His June 2012 conversation with Detective Higashiyama placed him in Yakima County. His October 2012 conversation with the detective placed him in Portland, Oregon. The detective testified that he had known Mr. Camarata to sometimes live in Pasco (Franklin County), sometimes in Yakima County, and sometimes in Multnomah County, Oregon. The State focused most of its trial energies on establishing that Mr. Camarata was *not* living on

14

Eighth Avenue in Ellensburg in 2012. And Ms. Higginbotham testified that in her conversations with Mr. Camarata in the spring of 2012, he refused to tell her where he was—circumstantial evidence that he was not in Kittitas County. Applying the proper standard of proof, the evidence was insufficient to establish that Mr. Camarata was physically present in Kittitas County when he provided the false information.

While Mr. Camarata focuses solely on *his* physical location, the State argues that the jury could reasonably find that the information was received in Kittitas County. The act of "providing information" implicates two locations: the location of the person providing the information and the location of the person to whom it is provided. We need not decide whether this is the most reasonable reading of the jury instructions, however, because it does not help the State. The evidence presented was that by using the website, Mr. Camarata was providing information to the secretary of state, in either Thurston County or Spokane County, not Kittitas County. Even the prosecutor stated in closing argument:

> [I]f you really want to get technical about it and think about it, it actually goes to the Secretary of State website in Olympia in Thurston County and then ultimately is funneled here as we learned through the testimony here in Kittitas County.

RP (Nov. 25 & 26, 2014) at 90. Finally, the dissent touches upon, and the concurrence examines, whether Mr. Camarata could "knowingly provide false information in Kittitas County, Washington" by conveying false electronic information to Spokane or Thurston

15

county that was then either retrieved by a Kittitas County user or transmitted to a Kittitas Count user by a third party. Importantly, we need not approach this as a question of statutory construction to be applied in other cases. The prosecutor now agrees that it was a mistake to include location as an element of the election offenses. We never expect to see this instructional issue again. We need only decide whether, in this case, the State's evidence was sufficient to prove that Mr. Camarata knowingly provided false information in Kittitas County on May 17 and 18, 2012.

As the concurring opinion demonstrates, it is not clear even from the full transcribed trial record whether, when or how electronic information received by the Secretary of State is affirmatively forwarded to counties, or if that information is simply accessible by county election personnel. If the State's evidence fell short of showing when or how that ordinarily occurs, then it necessarily fell short of proving beyond a reasonable doubt that *Mr. Camarata* knew when and how it would occur when he completed his voter application and declaration of candidacy on the Secretary of State's website.

As Mr. Camarata points out, he "does not argue that the *law* or the Legislature requires the State to prove he was present in Kittitas County when he submitted his applications . . . [b]ut, the plain language of the jury instructions requires [that] proof." Reply Br. at 5. The evidence is insufficient to prove that additional element of the "law

16

No. 32960-7-III
*State v. Camarata*

of this case." We reverse the convictions and remand with directions to dismiss the charges.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040:

Siddoway, J.

No. 32960-7-III

FEARING, C.J. (concurring) — I concur in the conclusion of the astute lead author that the law of the case doctrine, as applied to jury instructions, remains the law in Washington State, at least until the Washington Supreme Court overrules *State v. Hickman*, 135 Wn.2d 97, 954 P.2d 900 (1998). Therefore, the State needed to prove beyond a reasonable doubt that Gene Camarata committed the charged crimes in Kittitas County. I also concur in the lead author's decision to dismiss the charges against Gene Camarata.

I pen a concurring opinion because I disagree with the reasoning employed by the lead author. The lead author concludes that insufficient evidence supports a jury determination that Gene Camarata committed the crimes in Kittitas County. The lead author notes that the State presented no information as to where Camarata sat when he completed the electronic voter registration and candidate application forms, Camarata sent the forms to Thurston or Spokane County, and any arrival of Camarata's false information in Kittitas County was indirect. The dissenting author concludes that the State presented sufficient evidence to convict because Kittitas County received the false information. I am unable to agree with either the lead author or the dissenting author,

because we lack legal guidelines to assist in determining the situs of the crimes of providing a false statement when registering to vote and when applying as a candidate for office. Neither author cites any authority, let alone Washington law, that demarcates the locus of the crimes. To answer this question, I would need to review foreign law and, even then, I might only be guessing as to the correct answer to the question.

My uncertainty as to resolving this appeal begs a critical question. If I, as an appellate judge, need to spend hours of legal research to ascertain the county of the crimes and still arrive at a debatable answer, how could a jury of laypeople decide whether Gene Camarata committed the alleged offenses in Kittitas County? Along these lines, the jury instructions failed to intelligently notify the jurors as to how to decide whether Camarata committed the crimes in Kittitas County. The jurors were left to guess and to construct the law when resolving whether to convict Camarata. For these reasons, I would resolve the appeal on the ground that the jury instructions were unduly vague.

Gene Camarata did not object to the jury instructions. Therefore, we cannot reverse the case on unreliable jury instructions unless the instructions were unconstitutional and any error in instructing the jury was manifest constitutional error. I consider the opaque instructions to be an obvious constitutional mistake.

Jury instruction 6 told the Camarata jury: "To convict the defendant of the crime of [v]iolation of [v]oter [r]egistration [l]aw, the State of Washington must have proved beyond a reasonable doubt that[,] . . . [o]n or about May 17, 2012, *in Kittitas County*, Washington, the defendant knowingly provided false information on an application for

voter registration." Clerk's Papers (CP) at 62 (emphasis added). Jury instruction 8 informed the jury: "To convict the defendant of the crime of Providing False Information on [a] Declaration of Candidacy, the State of Washington must have proved beyond a reasonable doubt that[,] . . . [o]n or about May 18, 2012, *in Kittitas County*, Washington, the defendant knowingly provided false information on his declaration of candidacy." CP at 64 (emphasis added). The jurors were given no standards or principles of law to determine whether the crime was committed in Kittitas County.

Gene Camarata likely sat outside Kittitas County when he completed and sent by e-mail the voter registration and candidate registration forms to the Washington secretary of state's office in Thurston or Spokane County. The jury, as the trier of fact, could have discussed and resolved the location of Camarata at the time he sent the applications to the secretary of state's website. Nevertheless, the jury would then need to speculate as to whether one commits a crime in a named county when he pressed a computer's send button in another county to propel the information to a third county.

The use of the Internet raises new questions as to the location or locations of crimes, particularly when the Internet, at the half speed of light, spreads false information to the ends of the earth. The jury instructions failed to notify the jury as to whether a crime of providing false information by the Internet occurs at the location of the dispatcher, the location of a server to which authorities download the information, the location of where a viewer sees the false information, two of the three, or all three. The jury instructions did not inform the jury as to whether the crimes charged could be

3

committed in more than one county or whether the jury had to isolate one county as the sole location of the crimes.

The lead author emphasizes that Gene Camarata sent the false information to a secretary of state server in Spokane County or Thurston County and the secretary of state's server is the official database of voter registration. Nevertheless, this analysis fails to note that somehow officials in Kittitas County viewed the false information. Also, Gene Camarata probably expected the information to be seen in Kittitas County. Still the jury needed to speculate as to whether someone's anticipated view of the information in Kittitas County constituted the crime of knowingly providing false information in the county.

Some testimony suggests that Kittitas County downloaded the information on its own database or stored the information on one of its computers. Kittitas County Auditor Jerry Pettit testified that, once a person, who lives in Kittitas County, registers at the secretary of state's website, the secretary of state's database forwards the information to Kittitas County for its database. Pettit also testified that the secretary of state's computer system sends Kittitas County an electronic submission on the day that a Kittitas County voter registers. Camarata's registration "moved forward" to the Kittitas County database. Deputy Auditor Susan Higginbotham stated that exhibit 3A is the online submittal of Gene Camarata for his voter registration that Kittitas County received through its election management system. These facts may suggest that the crime was committed in Kittitas County, but the jury was not informed whether downloading the false information onto a

4

computer located in Kittitas County supports a verdict that the crime was committed in Kittitas County.

Other testimony suggests that Kittitas County never downloaded any information onto a county computer. Susan Higginbotham testified that, on May 17, 2012, she found that Camarata registered to vote at 1001 East Eighth, No. 4. She did not explicitly indicate how she "found" the information. Higginbotham testified that, before finding the information, she checked with the voter registration database and with the Washington elections information database. The jury was left to guess whether Higginbotham referred to the secretary of state's voter registration database or a Kittitas County voter registration database.

In later testimony, Susan Higginbotham declared that, after Gene Camarata called her to determine if his voter registration had "gone through," she accessed and searched the secretary of state's database, not the Kittitas County database, by using her credentials. Exhibit 2A, Gene Camarata's voter registration application, and exhibit 2B, the result of Susan Higginbotham's search for information about Camarata's voter registration, came from the State of Washington database, not the Kittitas County database. RP 109.

Exhibit 3B is a screen print of Gene Camarata's declaration of candidacy from the election information system for precinct committee officer of precinct 22 as a Democrat submitted on May 18, 2012. In testimony of Jerry Pettit and Nicholas Pharris, the

election information system is a secretary of state's database. One may wonder why a screenshot of a State database was needed if Kittitas County downloaded the information.

According to secretary of state employee Nicholas Pharris, county auditors and election staff may use an internet based interface and sign into the secretary of state's voter registration database and perform transactions there. Each county has an election management system which maintains its voter records and connects over the web to the voter registration database, which sends new registrations and updates to registrations.

Nicholas Pharris also testified that exhibit 2A and 2B, information on Gene Camarata's voter registration, was sent to the county for input into the county's voter registration system. Yet, he also stated that Kittitas County could "look" at the information, as if county officials are still accessing the secretary of state site.

Nicholas Pharris identified exhibit 3, the exhibit concerning Gene Camarata's declaration of candidacy, as coming from the secretary of state's Washington election information database that stores information on jurisdictions and the offices and candidates who file for the offices. Pharris stated that the Kittitas County auditor "could view and look at" this information through use of a password. Report of Proceedings (RP) (Nov. 24, 2014) at 170. This testimony might suggest that the declaration of candidacy was never downloaded onto a Kittitas County computer. Nevertheless, the jury was given no guidelines as to whether the location of any download could be the site of the crime.

6

Nicholas Pharris testified that the voter registration database compiled by the secretary of state, by statute, is the official list of voters in Washington. Perhaps then the possible downloading of any information in Kittitas County was of no importance and could not justify a finding that a crime was committed in Kittitas County. But the jury was never informed by the trial court as to what facts could justify a conclusion that the crime was committed in Kittitas County.

Perhaps my questions about what happened during the handling of Gene Camarata's voter and candidate applications foster nitpicky, unimportant distinctions. But the jury did not know what factors were important or unimportant in determining the site of crimes.

Our dissenting judge relies on venue and jurisdiction cases to conclude that facts support a finding that Gene Camarata committed the crimes in Kittitas County. *United States v. Angotti*, 105 F.3d 539 (9th Cir. 1997) and *State v. Woolverton*, 284 Kan. 59, 159 P.3d 985 (2007). The dissenter, however, forwards no decisions in which the State needed to prove, as an element of the crime, the location of the crime. The venue cases aid to a limited extent because, to show venue and jurisdiction, the State must show the situs, in part, of the crime. Nevertheless, the State must show venue or jurisdiction only by a preponderance of the evidence. In the State's case against Camarata, the State needed to show location of the crime in Kittitas County beyond a reasonable doubt.

A Texas court, in *Sepulveda v. State*, 729 S.W.2d 954 (Tex. App. 1987), concluded that the county in which a voter registration applicant delivers the application

7

constitutes the proper venue to prosecute the crime. Nevertheless, Esther Sepulveda submitted a registration card for Bernabe Luna, who incidentally was dead, to the Nueces County Voter Registration Department. The reviewing court summarily rejected Sepulveda's argument that Nueces County was not proper venue, since Sepulveda physically presented the registration card to authorities in Nueces County. So *Sepulveda* lacks relevance in addition to being a venue decision. Even assuming the Texas decision to be the law in Washington concerning the location of the crime, the jury was never informed of the law.

Even if the jurors arrived at the same factual conclusions, the jury needed to draw a legal conclusion from those facts as to whether Gene Camarata committed the crimes in Kittitas County. To convict Camarata, the jury necessarily rendered the legal determination that the indirect sending of false information through the Internet into a county or the viewing of false information on a computer in a county means the crime was committed in that county. To render the guilty verdict, the jury essentially became the determiner of the law. Judges, not jurors are to be the arbiters of the law. Art. IV, § 16, Washington Constitution.

The jury was in fact confused as to what rules to follow when determining the situs of the charged offenses. The jury wrote to the trial court:

> [P]lease give some clarification on Rule [jury instruction] 6 . . . [(1)] [D]id Gene need to be in Kittitas; or, [(2)] was the crime in Kittitas County physically.

RP (Nov. 26, 2014) at 197. In response, the trial court gave no assistance to the jury.

8

Washington requires that a jury instruction must properly inform the jury of the applicable law. *Crossen v. Skagit County*, 100 Wn.2d 355, 360, 669 P.2d 1244 (1983). This principle presupposes that the jury can understand, through the jury instruction, the status of the law. At least one case mentions the need for some specificity in a jury instruction. *Gammon v. Clark Equip. Co.*, 104 Wn.2d 613, 617, 707 P.2d 685 (1985). Another case directs the court to determine whether more specific or clarifying instructions are necessary to guard against misleading the jury. *Roberts v. Goerig*, 68 Wn.2d 442, 455, 413 P.2d 626 (1966). No Washington case, however, holds that a jury instruction lacked specificity, let alone was unconstitutionally vague.

The void for vagueness doctrine is typically applied to the wording of statutes. Nevertheless, the jury instruction in this case effectively acted as a statute. The instruction became the law or statute of the case.

Foreign decisions support a rule that a jury instruction may be unconstitutionally vague. In *Jackson v. State*, 648 So. 2d 85, 88 (Fla. 1994), the court held that the language of "cold, calculated and premediated" in a jury instruction was unconstitutionally vague. The court held, however, that the defendant had waived any error by not objecting to the jury instruction at trial. In *Sloan v. Delo*, 54 F.3d 1371, 1378 (8th Cir. 1995), the court held a jury instruction using the phrase "depravity of mind" to be unconstitutionally vague. The court, however, ruled the error to be harmless. In *Lara v. State*, 699 So. 2d 616 (Fla. 1997), the court found a jury instruction to be unconstitutionally vague and harmful. It vacated a death sentence. In *Rogers v. McDaniel*, 793 F.3d 1036 (9th Cir.

9

2015), our home federal circuit found a jury instruction in a criminal case unconstitutionally vague.

All of the foreign cases involving a vague jury instruction entail capital punishment offenses, and many rely primarily on the Eighth Amendment to the federal constitution. Nevertheless, none of the cases limit the void for vagueness doctrine to a death sentence.

Gene Camarata does not assign error to the vagueness of a jury instruction. RAP 12.1(b) asks that we seek input from the parties on a question we raise on our own before resolving the appeal on that new basis. I asked our reviewing panel that we send a letter to counsel and direct them to address whether the jury instructions were too vague for the jury to determine if Gene Camarata committed the charged crimes in Kittitas County and to examine whether any vague jury instructions constituted manifest constitutional error. Understandably, because other members of the panel decide the case on other grounds, my request was denied.

On the one hand, if a reviewing court finds insufficient evidence to convict the appellant of the crimes charged, the appeals court dismisses the charges. *State v. Teal*, 152 Wn.2d 333, 337-38, 96 P.3d 974 (2004). On the other hand, an instructional error typically leads to a reversal and remand for a new trial. *State v. Brown*, 147 Wn.2d 330, 349, 58 P.3d 889 (2002); *State v. Cronin*, 142 Wn.2d 568, 582, 14 P.3d 752 (2000). Although the error I identify can be classified as an instructional error, I would dismiss the charges rather than remand for a new trial. In any remand, the State should not be

10

free to omit the reference to Kittitas County in the jury instructions, because the State would essentially be amending the charges or altering the law of the case in a second trial. The State might clarify, in the jury instructions, what evidence or guidelines the jury should review when determining if the crimes occurred in Kittitas County. Nevertheless, Washington law is not developed sufficiently to provide these guidelines. The instructional error cannot readily be fixed. Therefore, dismissal remains the more apt remedy.

_Fearing, J._

Fearing, C.J.

No. 32960-7-III

PENNELL, J. (dissenting) — We are confronted with the question of where information is located when it is provided electronically. In the present context, the verb "to provide" is transitive. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1827 (1993). It contemplates both a subject (the provider) and an object (the recipient). *Id.* When it comes to electronic transmission, information can be provided from one location and received in another. In such circumstances, it stands to reason that the offense of providing false information will often encompass more than one location.

The State offered no information about Mr. Camarata's location at the time he submitted his false voter registration and declaration of candidacy. As a result, the situs of his offense cannot be established by looking to where Mr. Camarata's false information was initiated. But this does not end the matter. Because the act of providing electronic information can extend to more than one location, this case instead turns on whether the State satisfied its self-imposed burden of proving the information was received in Kittitas County. I believe it did.

Technically, computer-generated information is received by a series of locations, such as cell phone towers, routers, and servers. Testimony at trial suggested the data generated by Mr. Camarata's online voter registration and declaration of candidacy traveled over a series of internet connectors to a server in Cheney, Washington. Unless it was downloaded onto a computer hard drive, Mr. Camarata's information was never physically located in either Olympia or Kittitas County. Technically speaking, Mr.

Camarata's data was only physically provided to a data center in Cheney, which is located in Spokane County, Washington.

Analyzing the location of digital information in technical terms can lead to surprising results, especially in the context of increasingly popular cloud computing and remote data storage. For example, had the Secretary of State's Office contracted with a private cloud service provider with out-of-state servers, a technical approach to the location of digital information could lead to the curious result that the State of Washington might not have territorial jurisdiction over a fraudulent voter registration application. Fortunately, there is a simpler, nontechnical solution to this problem.

In common parlance, people are considered the senders and recipients of information, not servers or routers. Mr. Camarata was the sender of the information at issue in this case, not his computer or cell phone. Likewise, the recipient was the person or entity Mr. Camarata's information was intended to influence, not a server or web page manager. *See United States v. Angotti*, 105 F.3d 539, 543 (9th Cir. 1997) ("the act of making a communication continues until the communication is received by the person or persons whom it is intended to affect or influence"); *State v. Woolverton*, 284 Kan. 59, 70, 159 P.3d 985 (2007) (act of communicating a threat involves both speaking and perceiving, jurisdiction may be exercised over either component). Mr. Camarata undoubtedly intended his information to impact people in the Kittitas County Auditor's Office. Indeed, he called Kittitas County prior to sending the information and then

2

immediately afterward in order to make sure it had gone through. He never called Cheney or Olympia. Mr. Camarata's information traveled to its intended target and impacted the individuals in the Kittitas County Auditor's Office who processed his voter registration. This connection was sufficient to satisfy the court's jury instructions. *See State v. Hickman*, 135 Wn.2d 97, 954 P.2d 900 (1998) (situs for false insurance claim was in county where insurance company taking action located, not in county of alleged theft).

Because the evidence showed Mr. Camarata provided a false voter registration and declaration of candidacy to individuals in the Kittitas County Auditor's Office, I would hold the State produced sufficient evidence to comport with the jury instructions. Furthermore, because the act of providing electronic information can extend to more than one location, the prosecutor did not engage in misconduct by arguing the State need not prove Mr. Camarata's physical location in order to satisfy its burden of proof.

Mr. Camarata makes several additional claims of error. None are sufficient to warrant reversal. Because Mr. Camarata listed a fictitious residential unit, 1001 E. 8th Ave. #4, on his voter registration, the State presented sufficient evidence that Mr. Camarata knew his voter registration oath was false. Mr. Camarata's public trial rights were not violated when the court conducted peremptory challenges at sidebar. *State v. Love*, 183 Wn.2d 598, 605-07, 354 P.3d 841 (2015), *cert. denied*, 136 S. Ct. 1524 (2016). Finally, because Mr. Camarata's counsel acquiesced in the dismissal of a prospective

3

No. 32960-7-III
*State v. Camarata*

juror with an apparent felony, he waived appellate review of whether the dismissal was

proper. *State v. Cleary*, 166 Wn. App. 43, 49, 269 P.3d 367 (2012).

Mr. Camarata utilized the secretary of state's voter registration website to provide

a false voter registration application to Kittitas County. His conviction should be

affirmed. I respectfully dissent.

_____
Pennell, J.

4